UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                               :

CHARLET BURKETT,                    :
                               :
                Plaintiff,        :    **MEMORANDUM DECISION AND**
                               :    **ORDER**
         - against -             :
                               :    25-cv-3847 (BMC)
FIVE BELOW INC.,                  :
                               :
                Defendant.       :
                               :
----------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiff Charlet Burkett brings this diversity action against defendant Five Below, her former employer, for violations of the New York State Human Rights Law ("NYSHRL"), New York City Human Rights Law ("NYCHRL"), and New York City Victims of Gender-Motivated Violence Protection Law ("GMVPL").

Plaintiff claims that during her short tenure at Five Below, she was frequently harassed by a non-employee: the building landlord's security guard, Richard Nelson.  She says that she repeatedly told her manager, Rasheeda White, that Nelson made her uncomfortable, and believes that White overheard Nelson's derogatory comments to her, which included "Black witch" and "Black bitch."  Although White assured plaintiff that she would do something about it, nothing really changed.  Plaintiff and Nelson's animosity towards each other culminated in June 2024, when during a heated argument, plaintiff smacked Nelson in the face and Nelson beat her up in return.  Defendant then fired plaintiff for violating its Workplace Violence Policy.

This case is before the Court on defendant's motion for summary judgment.  Defendant's motion is granted in part and denied in part.

**BACKGROUND**

Plaintiff began working at Five Below in March 2024 as a Customer Experience Manager. In that role, she reported directly to White, the Store Manager, who reported to Michael Brown, the District Manager.

The Five Below store operated out of a leased space owned by a different entity that provided security guards for its building. None of the landlord's security guards were officially stationed at Five Below (in fact, Five Below employed its own security guards), but they would assist store employees when crimes occurred and could of course enter the store as patrons during store hours.

One of the landlord's security guards was Nelson. Plaintiff first "met" Nelson at the store's soft opening in March 2024, when she noticed him glaring meanly at her. About a week later, Nelson came back to the store and approached plaintiff while she was restocking items. He asked her if she and her "bad bitch friends" wanted to go out with him and his friends. She declined and said that she wasn't "into that." Plaintiff then turned back to her work but felt uncomfortable knowing that he was mad about the rejection, as she noticed Nelson had made an angry face in response. Although White claims to have not heard the exchange, plaintiff maintains that White was only twelve feet away at the time, that she immediately complained to White after it happened, and that White responded that she would tell Nelson to stay out of the store while plaintiff was there.

According to plaintiff, Nelson kept coming into the store when plaintiff was working, at least two to three times per week. Plaintiff would be walking into the store while Nelson was walking out, and as Nelson passed by, he would call her "Black witch" or "Black bitch."

Sometimes, he would be waiting right inside the door for her to come in and would announce things like, "Look at this bitch," or "This Black bitch coming," before walking out.

White again claims to have not heard these comments, and plaintiff again argues otherwise. Plaintiff's testimony on this point may not have been incredibly precise, but it was consistent:

> [White] would laugh about [the comments], like, "Yeah, I heard him say that." And then, like I said, the first time when I explained that to her, she laughed about it. And then this time it was, like, "It's not funny, it's really serious," you know? ... [W]hen I brung it up to [White], she laughed about it. But then, again, she's not a Black – like this. So it probably wouldn't bother her at all to be – to hear that a darker-skinned person is called a derogatory name or out their [sic] name.[1] You know, like I said, she laughed the first time. She said, "I'll speak to him." But I didn't find it funny at all because I felt like – I felt scared. Like, I felt scared and she didn't because it wasn't a threat to her, like – So I guess that's probably why she didn't take it as serious, because he speaks to her, which is not to me.

Plaintiff also says that she clocked out early on two occasions because Nelson was in the store, and that she told White that she was sick of having to do so.

White says she heard only one negative comment by Nelson about plaintiff. Specifically, White testified that in May 2024, another employee told White and plaintiff that Nelson had referred to plaintiff as "the devil." Plaintiff testified differently, recounting that the employee told them that Nelson had referred to plaintiff as "Black bitch." Plaintiff and White nonetheless agree that plaintiff said something to the effect of, "You see what I mean?" to White in response to hearing Nelson's comment about her (in White's version, "See, this is what I was talking about"). It was after *this* particular incident that White admits to having told Nelson not to come into the store while plaintiff was working; apparently that particular admonition prevented Nelson from coming in on at least one occasion.

---

[1] The parties agree that Nelson is Afro-Hispanic.

Plaintiff says that she also complained to Brown about Nelson's behavior.  Early on, she told him that Nelson made her uncomfortable.  Later on, she told him about the "Black bitch" and "Black witch" comments.  Plaintiff remembers Brown's response as dismissive, something to the effect of, "people could get like that over here."  Interestingly, Brown's declaration states that plaintiff "never made a complaint of discrimination ... to [him] during her employment."  It does *not* say that plaintiff never reported being called "Black bitch" or "Black witch."

On June 7, 2024, things between Nelson and plaintiff came to a head.  The store's security footage shows the following: Nelson walks to White's office while plaintiff pursues him; Nelson enters White's office, hugs her, then exits to find plaintiff waiting for him outside; plaintiff and Nelson begin arguing and gesturing at each other; White observes from inside her office and says something to them; plaintiff and Nelson continue arguing as they walk down the hallway; plaintiff then smacks Nelson in the face, and Nelson responds by punching plaintiff multiple times; White comes out of her office and attempts to separate them; plaintiff falls to the ground and tries to fend Nelson off with her legs; Nelson grabs plaintiff's leg and throws plaintiff across the floor, launching her into a dolly and knocking down White in the process.

Plaintiff initially confronted Nelson because he wasn't supposed to be in the back area.  She testified that she asked White to tell Nelson to leave, and that White agreed that he should leave.  Plaintiff and Nelson then started walking back to the main floor, during which time plaintiff claims that Nelson was repeatedly poking her.  Plaintiff then hit him, and he fought back, cursing at her nonstop.  It's not entirely clear from the video whether Nelson did, in fact, poke plaintiff (but it's not implausible, as the video shows Nelson thrusting four fingers towards plaintiff's face right before she smacks him), and there's no audio to confirm what was said.

4

Five Below reviewed the footage, concluded that plaintiff started the fight, and fired plaintiff for violating the Workplace Violence Policy.

## DISCUSSION

### I.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)). There is no genuine issue of material fact "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 212 (2d Cir. 2001) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

A party may not defeat a motion for summary judgment solely through "unsupported assertions" or conjecture. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Rather, "'[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita, 475 U.S. at 586-87); see also Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994). Indeed, the non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in [her] favor." Anderson, 477 U.S. at 256.

5

## II.      NYSHRL and NYCHRL Claims

Both the NYSHRL and NYCHRL causes of action in plaintiff's shotgun pleading reference racial and sexual discrimination, racial and sexual harassment and hostile work environment, and disparate treatment.  Plaintiff's failure to pick a theory of liability for each statute or otherwise separate her theories into distinct causes of action has created much confusion on summary judgment.  This is presumably why defendant's opening brief and plaintiff's opposition are like two ships passing in the night.

The essence of plaintiff's NYSHRL and NYCHRL claims is not that she was wrongfully terminated (or subject to any adverse action), but that defendant did not adequately shield her from Nelson's harassing conduct.  Simply put, plaintiff's NYSHRL and NYCHRL claims are hostile work environment claims.[2]  Accordingly, the Court must evaluate (1) whether Nelson's conduct created an actionable hostile work environment and separately, (2) whether defendant is liable for Nelson's conduct.

### A.  Hostile Work Environment

For both her NYSHRL and NYCHRL hostile work environment claims, "plaintiff must, at least, show that she was subjected to unequal treatment based upon membership in a protected class."[3]  Mercado v. Mount Sinai Beth Israel, No. 21-cv-10467, 2023 WL 5975322, at *14

---

[2] Plaintiff's opposition brief further supports the Court's conclusion that plaintiff has pursued only hostile work environment claims.  The brief has an argument section for hostile work environment but not discrimination, and it makes only a passing reference to the elements of a disparate treatment claim under the NYSHRL.  Additionally, the brief does not engage with the McDonnell Douglas burden-shifting analysis that applies to discrimination claims under the NYSHRL and NYCHRL.  See Wright v. White Plains Hosp. Med. Ctr., 237 A.D.3d 1143, 1145, 232 N.Y.S.3d 594, 594 (2nd Dep't 2025); see also Howard v. Consol. Edison Co. of New York, Inc., No. 22-1706, 2023 WL 8270808, at *1 (2d Cir. Nov. 30, 2023) (noting that NYSHRL discrimination claims are subject to McDonnell Douglas); Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010) (noting the same as to NYCHRL discrimination claims).

[3] Historically, hostile work environment claims under the NYSHRL were analyzed under a stricter standard than NYCHRL claims.  However, following the 2019 amendments to the NYSHRL, the NYSHRL and NYCHRL are now aligned.  See Edelman v. NYU Langone Health Sys., 141 F.4th 28, 45 n.9 (2d Cir. 2025); Wright, 237 A.D.3d at 1145, 232 N.Y.S.3d at 594; see also Allen v. City of New York, No. 24-cv-2589, 2025 WL 3152723, at *3 (2d Cir.

6

(S.D.N.Y. Sept. 14, 2023) (internal quotation marks and citations omitted); see also Verne v. New York City Dep't of Educ., 697 F. Supp. 3d 30, 61 (S.D.N.Y. 2023) (A plaintiff must "prove[] by a preponderance of the evidence that she has been treated less well than other employees because of her [protected status]." (Quoting Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 78, 872 N.Y.S.2d 27, 39 (1st Dep't 2009))).

Although there are some discrepancies between plaintiff's version of events and her coworkers' versions, the Court "cannot make credibility determinations between competing testimony on summary judgment," and must draw all reasonable inferences in plaintiff's favor. See Panora v. Deenora Corp, 467 F. Supp. 3d 38, 43 (E.D.N.Y. 2020). On balance, a reasonable jury could find that plaintiff was treated "less well" by Nelson based on her race, gender, or both.[4] After plaintiff rejected him, and apparently for the entirety of plaintiff's three-month employment, Nelson would come into the store and call plaintiff derogatory names (based on her race and gender), often in front of others or loud enough so that others could hear it. Any person would find Nelson's actions humiliating and hostile based on one's race and gender. Additionally, the fact that the rejection precipitated the mistreatment suggests that the comments, which were derogatory on their face, were rooted in gender-based animus. See Kaytor v. Elec. Boat Corp., 609 F.3d 537, 548 (2d Cir. 2010) ("[A] claim of gender-based hostile work

---

Nov. 12, 2025) (summary order) (relying on Wright). Some courts, particularly state courts, have not yet caught up with this change in the law. See, e.g., McIntosh v. City of New York, No. 2023-10734, 2026 WL 848926, at *3 (N.Y. App. Div. Mar. 25, 2026) ("A plaintiff alleging a hostile work environment animated by discrimination in violation of the NYSHRL must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.")

[4] Because plaintiff's claims survive summary judgment based on Nelson's comments, it is not necessary at this juncture to consider the relevance or impact of the "fight" between plaintiff and Nelson that ultimately led to her termination. However, the Court is not convinced that the fight can be classified as racial or sexual harassment. Even if Nelson poked plaintiff first, and even if he harbored racial or gender-based animus against her, plaintiff was the one who turned the argument – which was not race or gender-based – into a fight. At most, the significant force that Nelson unleashed in the fight might be evidence of his discriminatory animus; *perhaps* (and that is a big perhaps) he would not have used that much force against a non-Black man under the same circumstances.

environment ... may be premised on evidence that a supervisor heaped abuse on the plaintiff because she had rejected his sexual advances.").

### B. Imputation to Defendant

Having cleared the first hurdle, plaintiff must now show "a specific basis ... for imputing the conduct that created the hostile work environment to the employer." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 72 (2d Cir. 2000). Atypically here, the perpetrator (Nelson) and plaintiff do not work for the same employer.

District courts within this Circuit have applied two standards for evaluating employer liability for the conduct of non-employees under the NYSHRL. Under one standard, an employer will be held liable "only for its own negligence, and the plaintiff must demonstrate that the employer failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." Mucciarone v. Initiative, Inc., No. 18-cv-567, 2020 WL 1821116, at *9 (S.D.N.Y. Apr. 10, 2020) (internal quotation marks and citations omitted). "In determining the appropriateness of an employer's response, the Court looks to whether the response was immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility the employer has with respect to the harasser's behavior." Id. (alterations accepted) (internal quotation marks and citations omitted).

Under the other NYSHRL standard, an employer will be held liable only upon "'a showing that the employer became a party to the discriminatory conduct' by 'encourag[ing], condon[ing], or approv[ing] of the conduct.'" Swiderski v. Urb. Outfitters, Inc., No. 14-cv-6307, 2017 WL 6502221, at *9 (S.D.N.Y. Dec. 18, 2017) (quoting Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC, 470 F. Supp. 2d 345, 361 (S.D.N.Y. 2007)). "Condonation ...

contemplates a knowing, after-the-fact forgiveness or acceptance of an offense.  An employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation."  State Div. of Hum. Rts. on Complaint of Greene v. St. Elizabeth's Hosp., 66 N.Y.2d 684, 687, 496 N.Y.S.2d 411, 411 (1985).

Under the NYCHRL, an employer will be held liable for the conduct of a non-employee when the employer "knew of the [non-employee's] discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action" or "should have known of the [non-employee's] discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct."  See N.Y.C. Admin. Code § 8-107(13)(b).  Because the NYCHRL is keyed to the acts of employees and agents, not non-employees, courts apply the NYCHRL standard "with the qualification that [they] will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees."  See Swiderski, 2017 WL 6502221, at *7 (citation omitted).

Here, there is an issue of fact as to what defendant, through White and Brown, knew and should have known, and whether defendant should have done more.  Viewing the facts in the light most favorable to plaintiff, White overheard the derogatory comments (and the precipitating rejection), Brown knew about the derogatory comments from plaintiff, and both knew that Nelson's behavior, which was objectively offensive, made plaintiff subjectively uncomfortable.  A reasonable jury could find that White and Brown, as agents of defendant, knew about the harassment yet failed to take appropriate remedial action, and effectively condoned the harassment by not consistently keeping Nelson out of the store.  See Riggins v. Town of Berlin, No. 23-868-cv, 2024 WL 2972896, at *4 (2d Cir. June 13, 2024) ("[A]lthough the Town may not

have had the ability to control all of [the harasser's] behavior, it does not follow that the Town lacked any ability to attempt to dissuade [the harasser] from continuing his abusive conduct."); cf. Swiderski, 2017 WL 6502221, at *9 (finding that defendant did not encourage, condone, or approve of the customers' conduct because it ejected the customers from the store each time it had notice of their conduct).  Importantly, defendant has not argued that it could not keep Nelson out of the store while plaintiff was working, nor could it so argue: as defendant admits, White told Nelson on one occasion not to come into the store while plaintiff was working, and Nelson stayed out.

Although having anti-harassment and anti-retaliation policies certainly helps defendant's case, that is not enough as a matter of law without "good-faith efforts to enforce" those policies. See EEOC v. United Health Programs of Am., Inc., No. 14-cv-3673, 2020 WL 1083771, at *23 (E.D.N.Y. Mar. 6, 2020); Cioffi v. N.Y. Cmty. Bank, 465 F. Supp. 2d 202, 213 (E.D.N.Y. 2006). A reasonable jury could find that defendant's policies were hollow.  Indeed, Brown took no affirmative action to stop Nelson's conduct.  And although White took some action by keeping Nelson out of the store on one occasion, Nelson frequented the store many times thereafter.

Of course, Nelson was an agent of defendant's landlord and seems to have had some kind of right to enter the store in that capacity.  Nonetheless, a reasonable jury could find that there was more that White and Brown could or should have done, whether it be escalating the issue, complaining to the landlord, adjusting plaintiff's schedule, or something else.  In other words, a reasonable jury could find that defendant's actions were either below the standard of reasonable care or were not appropriate remedial actions.  See Riggins, 2024 WL 2972896, at *9 (finding that a reasonable jury could conclude that defendant's responses to its employee's complaints

10

about third-party harassment were not appropriate where, *inter alia*, "it [did] not appear that [defendant] made any effort to determine what its options were" to prevent the harassment).

The Court would be remiss not to flag that the parties have not offered any evidence on the availability of these aforementioned remedial measures.  All that the Court can really tell is that there were anti-harassment policies and a harassment reporting line in place, and that White was able to keep Nelson out of the store while plaintiff was working on one occasion.  It will be up to the jury to draw the inferences as to defendant had the obligation and ability to keep these people apart.

Because there is a genuine issue of fact as to whether Nelson's conduct is imputable to defendant, plaintiff's hostile work environment claims under the NYSHRL and NYCHRL survive.

### III.    GMVPL

The GMVPL provides a cause of action to "any person claiming to be injured by a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party."  N.Y.C. Code § 10-1104. To establish a claim of gender motivated violence, a plaintiff must show that: "(1) the act constitutes a misdemeanor or felony against her; (2) presenting a serious risk of physical injury; (3) that was perpetrated because of her gender; (4) in part because of animus against her gender." Rossbach v. Montefiore Med. Ctr., No. 19-cv-5758, 2021 WL 930710, at *10 (S.D.N.Y. Mar. 11, 2021) (citation omitted); see also N.Y.C. Code § 10-1103.

Plaintiff's GMVPL claim arises from Nelson striking her and cursing at her repeatedly, all of which was captured on video.  It is undisputed that Nelson's actions could constitute a crime presenting a serious risk of injury.  But there is no evidence (and, in fact, no argument

from plaintiff) that Nelson's conduct during the fight can be imputed to defendant.  That is, there is no evidence that defendant "enable[d]" Nelson to attack plaintiff just by letting him in the store – much less that defendant "commit[ted], direct[ed], ... participate[d] in, or conspire[d] in" the attack.  Even though plaintiff may have felt afraid of Nelson, there is no evidence that she communicated her fear of physical harm (as opposed to discomfort) to White or Brown, nor is there any evidence that Nelson was prone to violence.

Additionally, given Nelson's non-violent history (at least with respect to plaintiff), no reasonable jury could find that Nelson's attack was motivated by anything other than the fact that plaintiff hit him first.  This does not make Nelson's actions okay, but it gives them an irrefutable cause that is *not* plaintiff's gender. A victim of verbal abuse who is not under any physical threat does not get to haul off and level her verbal abuser.  Therefore, the Court grants summary judgment to defendant on plaintiff's GMVPL claim.

### CONCLUSION

Defendant's motion for summary judgment is granted as to plaintiff's GMVPL claims – as well as her discrimination claims, to the extent that she purports to bring them – and denied as to plaintiff's hostile work environment claims.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
      April 14, 2026